UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:05CR0434 CDP (AGF) |
| JOSEPH L. LUMETTA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Joseph L. Lumetta. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress evidence. (Doc. No. 21). An evidentiary hearing was held on September 16, 2005. The government was represented by Assistant United States Attorney Raymond M. Meyer. Defendant was present and represented by his attorney, Frank A. Anzalone. At the hearing, the government presented the testimony of Deputy Sheriff John Williams, who has been employed with the Warren County Sheriff's Department for approximately seven months. The witness was cross-examined extensively by defense counsel. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On the afternoon of Thursday, July 28, 2005, Deputy Sheriff John Williams ("Dep. Williams") was on routine patrol. At approximately 2:30 or 2:32 p.m., he heard a radio broadcast regarding an armed robbery that had taken place approximately 7-10 minutes earlier at the First Bank on Wentzville Parkway, in Wentzville, Missouri. The information initially received was that the suspects were driving a green Cavalier, headed westbound on the south outer road or service road, with a white male driving and a black male passenger. The passenger had been wearing a ski mask and was armed. No license plate information was provided. Slightly later, the radio broadcast indicated that an officer had set up at Foristell, but did not see the car go past. Dep. Williams did not recall having heard the information about the officer at the Foristell exit.

At the time of the broadcast, Dep. Williams was headed eastbound on the south service road. He was in uniform and driving a marked vehicle. Dep. Williams at that time had been employed with the Sheriff's Department for approximately five months, having graduated from the Police Academy in July 2004, and he was familiar with the First Bank and its location. In response to the call, he parked on the gravel shoulder at the Wildcat overpass of Interstate 70, at approximately mile marker 199, which allowed him to view both the service road and east and westbound I-70. The place where he stopped was approximately 10-13 miles from the bank, and he arrived there about two minutes after he heard the broadcast, at 2:35 or 2:40 p.m., which was approximately 10-15 minutes after the robbery. While he was waiting, Dep. Williams received further information on the radio that the suspects' car had a spoiler on the back.

The south outer road runs parallel to I-70, and Dep. Williams knew that a person heading west from the area of the bank could easily enter the highway. The nearest on-ramp was at Foristell and the next was the Wildcat on-ramp, near where he was parked. Dep. Williams observed a green car with a spoiler go past heading west on I-70, at approximately 2:49 p.m. Although he was unsure if the car was a Cavalier or a Sunfire, he believed it was a Sunfire. He knew, however, that the two cars were both made by General Motors and that they were very similar in appearance. Given the similarity in appearance, Dep. Williams thought it possible that the person or persons describing the getaway car may have been mistaken. During his surveillance, he had not observed any other green cars or cars similar in appearance. He could not see the driver at the time and did not know if there was a passenger in the vehicle. If the driver had left the outer road and gotten on the highway headed west, the time of its arrival at this location was consistent with the time it would have taken to drive from the bank following the robbery.

Suspecting that the car he had observed might be that of the suspects', Dep. Williams advised the dispatcher of what he had observed and said he would try to locate the car. He made a U-turn and headed westbound on I-70. He lost visual contact with the car for approximately five minutes, but then saw the car exiting at mile marker 193, the Warrenton exit, where Highway 47 crosses. The green car exited the highway and entered onto Highway 47 heading north, where it stopped at a red light. At approximately 2:54 p.m., Dep. pulled alongside, slightly behind the car, to observe the occupants. He confirmed that the car was in fact a Sunfire, and that the driver was a white male. Gov't Exs. 3 & 4. He did not see any passenger, but could not rule out that

-3-

the passenger might be lying down.  He was familiar with the area between the bank and where he had first observed the car, and knew that there were places along the south outer road where a passenger could have been dropped off.

The green car turned westbound on the north service road and turned on its blinker, signaling that it was going to enter the Wal-Mart parking lot.  At that point, Dep. Williams advised the dispatcher where he was, activated his lights and sirens, and pulled the car over.  The driver pulled over on the Wal-Mart parking lot, and Dep. Williams stopped his patrol car and exited.  He unsnapped his holster, but did not remove his firearm.  The driver was a white male, later identified as Defendant Lumetta.  Dep. Williams was able to see Defendant's hands, and also saw that there was no passenger in the car.

Dep. Williams identified himself, and advised Defendant that his vehicle matched the description of one used in an armed robbery.  He asked Defendant for his license and insurance.  He slipped up and asked Defendant if he was coming from the Wal-Mart, and Defendant said he was coming from work at Rothman Furniture in O'Fallon.  He handed Dep. Williams a Missouri non-driver's license and an envelope that contained a Missouri hardship privilege.  Gov't Ex. 1.  Defendant did not provide any insurance information.  Dep. Williams was familiar with hardship privilege documents.  Defendant's hardship privilege granted him an "amended Limited Driving Privilege" subject to conditions.  The conditions stated:

> You shall operate your vehicle in a direct route from your residence only in connection with or in the course of:

> A business, occupation or employment:
>     WEEKENDS ONLY, 1355 S FITH (sic) ST, ST CHARLES, MO
> Seeking medical treatment for yourself or a family member.
> Attending school or institution of higher education.
> TO/FROM OFFICE OF PROBATION OFFICER & TO/FROM ST
> CHARLES COMMUNITY COLLEGE, FIFTH ST, ST. CHARLES, MO

The order was effective on June 29, 2004, and was set to expire on October 27, 2005. Id.

Dep. Williams, not realizing that Weekends Only was the name of a store, mistakenly believed that Defendant's hardship privilege permitted him to drive to and from his employment only on weekends, and this was a weekday. Dep. Williams asked Defendant to stay in his vehicle, and he walked away from the car to call in Defendant's information. The department responded that Defendant's license had been revoked and that he was eligible for reinstatement, and that he had a prior record for assault. Dep. Williams could not recall if he also received radio information regarding his hardship permit. By this time, Sgt. Schluetter, from the Warrenton City Police Department, had arrived at the scene. He advised Dep. Williams that he knew Defendant from a previous incident, during which Defendant had fallen asleep in his vehicle, and Sgt. Schluetter had found something in Defendant's vehicle but had let me go on his way.

Dep. Williams and Sgt. Schluetter returned to Defendant and asked him to step out of the car. They conducted a pat-down for weapons, but did not find any weapons. By this time a third officer, Dep. Clemons, also arrived at the scene. Dep. Clemens asked Defendant where he was coming from and where he was going to. Defendant said he was coming from Rothman Furniture in O'Fallon and was going to Wal-Mart to buy

deodorant. Dep. Williams asked Defendant for consent to search his car, and he said no, that he needed to call his attorney first.[1]

Defendant was placed under arrest for driving with a revoked license. While Dep. Williams had discretion to issue a summons in lieu of arresting Defendant, the department encouraged officers to arrest individuals for driving under a suspended or revoked license, and it was Dep. Williams' practice to arrest such individuals. Not more than 5-10 minutes passed from the initial stop until Defendant was placed under arrest. Defendant asked the officers to lock his vehicle and asked if he could call his mom to pick up the car. Dep. Williams and Dep. Clemons, having been advised that merchants generally did not like vehicles left on their lots following the arrest of the driver, advised Defendant that Wal-Mart had a policy that cars not be left on their lot, and told him they were going to have the car towed.

The officers asked Defendant to remove everything from his pockets, and he removed keys and his wallet. Defendant was placed in handcuffs and searched incident to his arrest. In his right front pant pocket, Dep. Williams felt a lump that felt like a wad of paper. He removed the item from Defendant's pocket and found two crumpled, paper currency bands from First Bank, date-stamped July 28, the same date of the robbery.

---

[1] At the hearing, Dep. Williams was unsure whether they asked for consent to search prior to asking where he was coming from and going to. On cross-examination, when defense counsel advised that the police report said the officers first asked where he was going and then asked for consent, Dep. Williams conceded that if that was what the police report reflected, he accepted it as correct. The Court likewise finds the inquiry regarding Defendant's destination preceded the request for consent to search.

The officers had Defendant sit in the back of Dep. Williams' patrol vehicle, and Dep. Williams and Officer Clemens proceeded to search Defendant's vehicle. After Defendant was placed in the back of the patrol car, they issued citations for driving while revoked and not properly affixing the front license plate. Govt. Ex. 2. Dep. Williams believed the car would be towed and intended to conduct an inventory search. The officers did not actually begin to complete an inventory form, however, because they immediately saw a pair of gloves on the passenger floorboard. Gov't Ex. 5. Behind the passenger seat they saw a black cloth mask. They opened the glove box and found a revolver. Gov't Ex. 6. At this point, the officers alerted Wentzville police of what they had found, and detectives arrived from Wentzville and took over the investigation. Those detectives placed Defendant under arrest for bank robbery and took custody of both Defendant and the car.

## CONCLUSIONS OF LAW

A.  **Reasonable Suspicion for Terry Stop**

Defendant's main assertion in this case is that the officer did not have reasonable suspicion to stop Defendant's car.[2] Police officers may briefly stop a vehicle for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). The level of proof necessary is "considerably less than proof of

---

[2] Defendant conceded at the hearing that if the initial stop was lawful, the remainder of what transpired was probably proper, although he noted that no evidence regarding the procedures for an inventory search were admitted.

wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989). The reasonable belief requires suspicion based on "'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 499 U.S. 411, 418 (1981)).

Here, there was no question that a crime had been committed, the only question is whether Dep. Williams had a reasonable, articulable basis for concluding that this particular car and individual might be involved. The car he observed was green, had a spoiler on the back, and was similar in appearance to that of a Cavalier. It was headed in the same direction as the getaway car, and its location was consistent with how long it would have taken a car leaving the scene to arrive at that point. During the time he was stationed at his point of observation, he did not see any other cars matching that description. Dep. Williams also confirmed that the driver was a white male. That the car was on Interstate 70, rather than the south outer road is of no moment; the outer road ran parallel to Interstate 70, and the officer knew that there was easy access from the outer road onto the interstate, permitting travel in the same direction.

On these facts, the Court concludes that Dep. Williams had a reasonable basis to conduct an investigative stop. See United States v. Juvenile TK, 134 F.3d 899, 902 (8th Cir. 1989). In Juvenile TK, officers received information from dispatch at 3:10 a.m. regarding a man who had reportedly broken the window of a car, who had a gun and had gotten into a grey vehicle. Approximately 40 minutes later, a second call was received regarding a gas station in a town approximately five miles from the first, indicating that a man had brandished a weapon and gotten into a grey car. No license information was available with respect to either call. Two minutes later, the officers observed a grey car driving eastbound, a few blocks from the gas station. An officer had testified that there was a casino outside of town, and that cars would enter and leave the casino all the time, even at 4:00 a.m. The Eighth Circuit found the officers had reasonable ground for a Terry stop, based on the short distance between the location of the car and the crime scene, the short period of time between the second dispatch and the stop, the time of the stop, and the fact that the conduct alleged was clearly criminal. Id. at 904. See also United States v. Raino, 980 F.2d 1148, 1150 (8th Cir. 1992) (where police received a report of shots fired in connection with a drive-by shooting involving a light blue El Camino, and thereafter received another report of shots fired in the area, officers were justified in conducting an investigative stop of a white BMW stopped in the area, despite the fact that it did not match the description given, as they had no information regarding the source of the subsequent shots fired).

Defendant asserts that the officer could not have reasonable suspicion because the car was a Sunfire, rather than a Cavalier, and did not contain a passenger. These facts,

-9-

however, do not preclude a finding of reasonable cause.  The officer was quite familiar with the area, and knew that there were places along the south outer road where a passenger could have been let out.  He also knew that the Sunfire and Cavalier were both manufactured by General Motors and were similar in appearance, and believed that an individual could easily confuse the two cars.

In <u>United States v. Marxen</u>, 410 F.3d 326 (6th Cir. 2005), the police received a call that a silver or grey Nissan Altima, with a license number of 002 5CJ,[3] had been used as the getaway car for an armed robbery of a convenience store.  Officers believed that defendant Nissan Altima matched the description, although it may have been blue rather than silver, and the license was 002 FCJ rather than 002 5CJ.  Although the defendant did not match the description of the robbers, and was placed under surveillance for several days and never met with anyone matching the description of the robbers, the court held that the officers were justified, some 11 days after the robbery, in making a <u>Terry</u> stop of the vehicle.  With regard to the difference in the license numbers, the court noted:

> Whether the police believed that the car used in the robbery had a license number of 002 FCJ or 002 5CJ does not affect the court's assessment that the police had reasonable suspicion to stop Marxen's vehicle.  Trained police officers are aware that a witness observing a getaway vehicle may see some, but not all, letters and numbers correctly.  While a minor error may be due to the excitement of the moment, failing eyesight, insufficient lighting, obscured license numbers, or some other factor, identification of five of six letters and numbers in proper sequence is sufficient identification of a license plate.

---

[3] The actual license number provided by the witness was 002 FCJ, but the dispatcher mistakenly provided the number 002 5CJ.

Id. at 331.  Cf. Creighton v. Anderson, 922 F.2d 443, 450 (8th Cir. 1990) (reasonable for officers to stop a car though the license plate and description of the car were somewhat different than description given of getaway car, in context of Bivens action, in determining whether officer could reasonably have believed there was probable cause).

The Supreme Court has directed that when reviewing the reasonableness of an investigatory stop, courts must give "due weight" to an officer's determination, recognizing that an officer's specialized training and experience might permit him to make inferences that "might well elude an untrained person."  Arvizu, 534 U.S. at 273-74.  Here, Dep. Williams was familiar with the two automobiles and, based on his training and experience, was aware that an individual attempting to distinguish the two in the context of a bank robbery could easily confuse the two.  Defendant has presented no evidence to suggest the two models are not in fact similar in appearance.  On this record, Dep. Williams' assessment that the getaway car could in fact have been a Sunfire rather than a Cavalier is entitled to due weight.

Inasmuch as Dep. Williams had reasonable cause for the initial stop, the officers were justified in requesting Defendant's identification, license and registration, inquiring about the purpose of his travel, and running a computer check.  Terry, 392 U.S. 22-24; United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) ("Once a lawful stop has occurred, officers are entitled to conduct an investigation 'reasonably related in scope to the circumstances which justified the interference in the first place.'") (citations omitted); United States v. Tuley, 161 F.3d 513, 515 (8th Cir. 1998) (same); United States v. Thomas , 863 F.2d 622, 628 (9th Cir. 1988).   The officers were also justified in

conducting a pat-down search of Defendant, as they had reasonable grounds to believe that Defendant had been involved in a bank robbery where a firearm had been observed. Terry, 392 U.S. at 28-30; Beck, 140 F.3d at 1134.

### B. Probable Cause for Arrest

After the officers obtained Defendant's hardship permit and learned from Defendant that he was going to Wal-Mart to purchase deodorant, they had probable cause to believe that he had violated Mo. Rev. Stat. § 302.321 (driving while license revoked), as his permit restricted him to driving to and from work, and did not permit him to drive on the road to do shopping. Hill v. Benton, 804 S.W.2d 805, 807-8 (Mo. App. 1991) ("We agree that if a driver's license is suspended or revoked, failure to comply with the restrictions of limited driving privilege may constitute 'operating a motor vehicle without a valid driver's license,' in violation of § 302.020. Arguably, such failure could also be a violation of § 302.321, driving while privileges have been suspended or revoked."); State v. Shy, 761 S.W.2d 280, 282 (Mo. App. 1988) (violation of terms of hardship driving privilege basis for conviction for driving motor vehicle while operator's license revoked; proof of compliance with hardship is matter of affirmative defense). As such, the officers were justified in arresting Defendant for the violation. United States v. Reed, 220 F.3d 476, 478 (6th Cir. 2000) cert. denied, 531 U.S. 1103 (2001) ("Where probable cause exists, '[a] police officer is permitted to make an arrest without a warrant for a misdemeanor committed in his presence.'") (quoting United States v. Smith, 73 F.3d 1414, 1416 (6th Cir. 1996)). As such, it is unnecessary for the Court to reach the issue of

whether the officers were also justified in arresting Defendant based on their mistaken belief that he was not allowed to drive on weekdays.[4]

## C. Search of Defendant

Inasmuch as the officers had probable cause to arrest Defendant for driving with a revoked license, they were authorized to search Defendant pursuant to his arrest. New York v. Belton, 453 U.S. 454, 461 (1981); United States v. Robinson, 414 U.S. 218, 224 (1973). As such, the paper currency bands found in Defendant's pocket are not subject to suppression.

## D. Search of Defendant's Car

Although Defendant had refused to provide consent to search his car, the officers were nonetheless authorized to conduct an inventory search of Defendant's car in advance of having the vehicle towed. Police may take a vehicle into custody and have it towed when they have arrested the vehicle's occupants, even if the vehicle is lawfully parked and does not pose any hazard. United States v. Hood, 183 F.3d 744, 746 (8th Cir. 1999); United States v. LaFountain, 252 F. Supp. 2d 883, 887 (D.N.D. 2003). Although Defendant suggested through cross-examination that the officers had no such intent, as they had not completed an inventory sheet, it is clear under these facts that the officers

---

[4] See United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999) (even if trailer not technically in violation of statute, probable cause found based on officer's reasonable belief trailer violated statute). Arguably, Defendant's license also did not permit him to drive to and from employment at any place other than Weekends Only, but it is also unnecessary for the Court to reach this issue.

turned the matter over to another jurisdiction and abandoned their efforts to tow the vehicle once they found evidence in the car clearly linking it to the bank robbery.

In addition, the officers were authorized to search any areas of the vehicle to which Defendant had had access, including the front seat where they initially found the gloves and the glove compartment which contained the firearm, pursuant to Defendant's custodial arrest. Thornton v. United States, 541 U.S. 615, 124 S.Ct. 2127, 2132 (2004); United States v. Poggemiller, 375 F.3d 686, 688 (8th Cir. 2004), cert. denied, 125 S.Ct. 1614 (2005). Although Defendant has not independently challenged the further search and seizure of items from the vehicle following Defendant's arrest on the bank robbery charge, once they discovered the gloves, mask, and firearm, there was probable cause to believe that the vehicle had been used in connection with the bank robbery and contained evidence related to the robbery. They were therefore justified in seizing the car and conducting a warrantless search. United States v. Ross, 456 U.S. 798, 804-09 (1982); Chambers v. Maroney, 399 U.S. 42, 44, 52 (1970). As such, although no evidence was presented regarding any additional evidence found by the Wentzville police (which apparently includes currency found by them), such evidence would not be subject to suppression.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence [Doc. No. 21] be **denied**.

Trial in this matter has been set for **Monday, November 14, 2005, at 9:00 a.m.**, before the **Honorable Catherine D. Perry**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 5th day of October, 2005.